IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Dennis Nelson, | ) | OPINION |
| | ) | |
| Petitioner, | ) | Case No. 20100976-CA |
| | ) | |
| v. | ) | |
| | ) | F I L E D |
| Orem City, Department of Public Safety; | ) | (May 17, 2012) |
| and Director Michael Larsen, | ) | |
| | ) | 2012 UT App 147 |
| Respondents. | ) | |

-----

Original Proceeding in this Court

Attorneys:     Phillip W. Dyer and B. Kent Morgan, Salt Lake City, for Petitioner
              Stanley J. Preston, Bryan M. Scott, and Stephen J. Preston, Salt Lake
              City, for Respondents

-----

Before Judges Voros, Orme, and Christiansen.

CHRISTIANSEN, Judge:

¶1     Dennis Nelson seeks our review of the Orem City Employee Appeals Board's
(the Board) decision upholding the Orem City Police Department's (the OCPD)
termination of his employment on October 29, 2009.  We decline to disturb the Board's
decision.[1]

---

[1]We commend both parties' counsel for their thorough briefing in this matter.

¶2 Dennis Nelson was a police officer for Orem City (the City) for nearly fifteen years. The OCPD's decision to terminate Nelson was based on a single incident that occurred on September 19, 2009. "Nelson had no prior history of discipline while employed with the [OCPD]" and he "had an average performance evaluation rating of 3.53 (on a scale of 1-5)."

### I. The September 19, 2009 Incident

¶3 At nearly midnight on September 18, 2009, Nelson responded to the Utah County Major Crime Task Force's (the UCMC) request for an officer to transport an individual, Brandon Fox, to the jail. Fox was arrested for, charged with, and pleaded guilty to, inter alia, interfering with the UCMC officers. However, at the time Nelson transported Fox, Nelson did not know that Fox had earlier resisted the UCMC officers.

¶4 The Board described what happened when Nelson and Fox arrived at the police station. The Board was aided by a recording captured by two types of cameras—a real-time camera and a frame-by-frame camera. In the booking area, after removing Fox's handcuffs, Nelson asked Fox to remove a string bracelet from his wrist. Fox removed the bracelet, dropped it on the floor, and said, "[I]t's all yours." Fox was "casually swinging his arms back and forth and swung his arms forward and brought his hands together in front of him in front of his chest" as "a gesture made as part of his response of 'it's all yours' and appeared to communicate the meaning of 'go ahead and take it.'" The Board observed that

> Fox . . . tilt[ed] his head back slightly at this point and was
> glaring at Nelson . . . . [Fox] did not make any other
> aggressive or threatening gestures at this time. He did not
> "square up" as if preparing for a fight, and he did not roll up

---

[2]It is important to note at the outset that even though Nelson refers to evidence upon which the Board did not rely, he does not challenge the Board's findings of fact. Therefore, in determining whether the "[B]oard abused its discretion or exceeded its authority," our review is limited to "the record of the appeal board," *see* Utah Code Ann. § 10-3-1106(6)(c) (Supp. 2011), and we recite the facts accordingly.

or roll back his shoulders. He was refusing to obey Nelson's command to pick up the bracelet, but there was no other threatening behavior or indicia of aggression. Nothing in Fox's behavior at this time suggests that Fox was threatening or preparing to attack Nelson.

As the Board found, Nelson then said, "'pick that f****ing thing up and put it on the counter' and then almost simultaneously put his hands on Fox and pushed Fox toward the door leading to the jail cells." Nelson did not instruct Fox where to go or where Nelson was taking Fox, and "[a]s Nelson was moving Fox toward the door, Fox put his left hand out on the door frame and Fox was pushed into the left edge of the door frame." Nelson moved Fox into the room and "threw Fox to the floor" while saying, "'[A]lright a**hole.'" Then, "Nelson put Fox on Fox's stomach and Nelson briefly put his right knee on Fox's back . . . ." Nelson positioned himself so that his knees were straddling Fox. Nelson put Fox's left arm into a "control hold" by putting it behind Fox's back "and moving it up toward Fox's head."

¶5 The Board noted, "At this point, Fox was not fighting or resisting and Nelson had Fox under control." The Board also observed that Fox had "sustained a cut above his right eye that ultimately required two stitches [and was] caused when Nelson threw [Fox] to the ground." Nelson called for medical assistance on his radio.

¶6 After fifty-five seconds of keeping Fox in a control hold with his left arm, Nelson placed Fox's right arm in another control hold. Nelson continued to hold Fox's arms in control holds and also moved his knee onto Fox's back, which, the Board noted, caused Fox "distress and pain" and caused Fox to "grunt[]" and strain his voice when he spoke. As the Board described, "Nelson pushe[d] both of Fox's arms higher on Fox's back so that Fox's hands [we]re almost touching the back of his head. Fox's legs move[d] upward as he d[id] so and you c[ould] hear Fox grunt apparently in pain." Fox then stated, "'I'm not gonna fight you dude . . . .'" After that, Nelson "relaxe[d] the control hold on Fox's arms and allow[ed] Fox's hands to move several inches down Fox's back." Nelson adjusted his knees several times, and, at one point, "Fox barely move[d]" and "beg[a]n to breathe heavily." After Fox did not respond to Nelson's question about whether Fox was having trouble breathing, Nelson finally moved Fox into a sitting position while keeping his arms in control holds. According to the Board, "Nelson had Fox on the ground . . . for three minutes and 42 seconds. At no time after Nelson took Fox to the ground did Fox ever resist or attempt to fight with Nelson."

## II. Disciplinary Action Taken After the Incident

¶7     Lieutenant Gary Giles conducted a "use of force review" of the September 19, 2009 incident, which included reviewing the video, hearing Nelson's account of the incident, and speaking to Fox by telephone.  Giles prepared a report in which he concluded "that physical force was not justified and was done in violation of established department policies[,] . . . was used as punishment, and was inappropriate."

¶8     Captain Bob Conner also reviewed the incident.  Conner reviewed the video and Giles's report and "concluded that Nelson had violated City policies by using excessive force and by being untruthful in the investigation of the incident."  On October 6, 2009, Conner issued a notice of intent to terminate Nelson's employment.

¶9     Nelson appealed the notice of intent to terminate his employment to the Orem Director of Public Safety, Mike Larsen.[3]  On October 20, 2009, Nelson and his attorney met with Larsen.  After considering the information that Nelson and his attorney presented at the meeting, the transcript from the October 20, 2009 meeting, the notice of intent, the incident reports, Nelson's appeal notes, the OCPD's use of force policy, the videos from the booking room, and Giles's report, Larsen upheld Conner's decision to terminate Nelson's employment.  Larsen wrote his decision in a memorandum dated October 29, 2009, and Nelson was officially terminated as of that date.

## III. The Board's Decision

¶10    After Larsen refused to reinstate Nelson's employment, Nelson appealed to the Board.  The Board held a hearing on October 27, 2010.  The Board affirmed the OCPD's decision to terminate Nelson's employment but reversed the OCPD's charge of dishonesty.

---

[3]The OCPD is part of the Orem Department of Public Safety.  Throughout this opinion, when discussing the sanction against Nelson, sanctions against prior employees, and the departmental policy, we reference the OCPD rather than the Orem Department of Public Safety for simplicity and brevity and because, at least in these circumstances, the distinction between the departments is not relevant.

¶11    The Board conducted its review under the Orem City Municipal Code. *See* Utah Code Ann. § 10-3-1106(7)(a) (Supp. 2011) ("[T]he procedure for conducting an appeal and the standard of review shall be prescribed by the governing body of each municipality by ordinance."); Orem City Code § 2-26-12 ("The Board shall uphold the Department Director's decision against the appealing employee unless the Board finds that the decision was arbitrary and capricious or otherwise illegal[, and] the Board shall apply a substantial evidence test when determining if the Department Director's decision was arbitrary and capricious."). The Board reviewed two inquiries: "(1) do the facts support the charges made by the department head, and, if so, (2) do the charges warrant the sanction imposed?" *See Kelly v. Salt Lake City Civil Serv. Comm'n*, 2000 UT App 235, ¶ 16, 8 P.3d 1048 (internal quotation marks omitted).

¶12    In response to its first inquiry, the Board concluded that the facts supported the OCPD's determination that Nelson used excessive force. The Board found that, based on the OCPD's policy of use of force,

> (1) Nelson used more force than was reasonably necessary to do his job, (2) Nelson used force as a means of inflicting punishment, humiliation and mental abuse, and (3) the use of physical force in dealing with Fox was not limited to self defense, protection of the officer, making a lawful seizure of an individual, prevention of escape, or bringing an unlawful situation safely and effectively under control.

¶13    In response to its second inquiry, the Board concluded that the charge warranted Nelson's termination. The Board initially determined that "[t]he sanction of termination was proportional to the charge of use of excessive force." The grounds for the Board's finding of proportionality were that "Nelson's excessive use of force . . . could substantially undermine public confidence in the" OCPD and that "the use of excessive force by Nelson had the potential to significantly undermine the morale and discipline within the [OCPD]." The Board also considered the fact that Nelson acknowledged that he had "violated a couple [of] policies."

¶14    The Board concluded that Nelson's use of excessive force on September 19, 2009, warranted Nelson's termination when it determined not only that the sanction was proportional to the charge but also that "the sanction of termination was consistent with previous" OCPD sanctions. The Board considered treatment of several other OCPD

employees whom Nelson claimed exhibited the same or more egregious conduct but who were sanctioned less harshly. After a thorough examination, the Board determined that the most comparable cases "d[id] not establish a prima facie case of inconsistent treatment because they all involve[d] conduct that [wa]s substantially different from the conduct that led to Nelson's termination," and that, in the case of one former employee, Officer Scott Healy, "Nelson's use of force was more excessive."

ISSUES AND STANDARDS OF REVIEW

¶15    Nelson challenges the Board's decision to uphold the OCPD's termination of his employment as a sanction for his use of excessive force in violation of the OCPD's policy. Nelson challenges neither the Board's finding that he violated the policy nor its determination that the OCPD could terminate Nelson as a sanction for doing so.[4] Instead, Nelson argues, first, that the Board improperly concluded that the OCPD's sanction of termination was proportional to its use of excessive force charge. "The Court of Appeals' review shall be on the record of the appeal board and for the purpose of determining if the appeal board abused its discretion or exceeded its authority." Utah Code Ann. § 10-3-1106(6)(c); *see also Harmon v. Ogden City Civil Serv. Comm'n (Harmon II)*, 2007 UT App 336, ¶ 6, 171 P.3d 474 (reviewing the Ogden Civil Service Commission's decision to terminate a fire department captain's employment for abuse of discretion).

¶16    Second, Nelson argues that the Board erred when it concluded that the OCPD's sanction of termination was consistent with its prior sanctions of other employees. As with proportionality, our review of the consistency of the OCPD's sanction is limited to "determining if the appeal board abused its discretion or exceeded its authority."[5] *See*

---

[4]Nelson does not challenge the Board's findings of fact, including the facts supporting the use of excessive force charge. He therefore does not deny that he violated the policy. In fact, he previously "acknowledged that some of his actions were inappropriate."

[5]Nelson argues that this court should review this issue as a violation of his due process rights under a correctness standard because he does not challenge any of the Board's findings of fact. *See generally Tolman v. Salt Lake Cnty. Attorney*, 818 P.2d 23, 28

(continued...)

Utah Code Ann. § 10-3-1106(6)(c); *see also Kelly*, 2000 UT App 235, ¶ 15 (reviewing the commission's final decision regarding its determination on consistency of sanctions under an abuse of discretion standard).

¶17    Thus, we review for abuse of discretion both aspects—proportionality and consistency—of the Board's determination that Nelson's use of excessive force warranted the OCPD's termination of Nelson's employment.  "Because the [OCPD and Department of Public Safety Director] '[are] best able to balance the competing concerns in pursuing a particular disciplinary action,' the Board was 'required to give deference to the [Director].'"  *See Guenon v. Midvale City*, 2010 UT App 51, ¶ 4, 230 P.3d 1032 (mem.) (quoting *Harmon II*, 2007 UT App 336, ¶ 6), *cert. denied*, 238 P.3d 443.  We will accordingly uphold the Board's affirmance of the City's decision to terminate Nelson "unless it exceeds the bounds of reasonableness and rationality."  *See Harmon II*, 2007 UT App 336, ¶ 6 (internal quotation marks omitted).

¶18    Third, Nelson claims that the Board deprived him of his constitutional right to due process because the Board was partial to the City at the October 27, 2010 hearing and because it permitted testimony from the City's expert with whom Nelson had previously consulted.  We review these due process claims for correctness.  *See Chen v. Stewart*, 2004 UT 82, ¶ 25, 100 P.3d 1177.


ANALYSIS

¶19    To prevail in his petition for review of the Board's affirmance of the OCPD's decision to terminate his employment, Nelson "must show either (1) that the facts do not support the action taken by the [OCPD] or (2) that the charges do not warrant the

---

[5](...continued)
(Utah Ct. App. 1991) ("Due process challenges . . . are questions of general law and we give no deference to the agency's determination of what constitutes due process . . . .").  Although we acknowledge that the consistency with which the OCPD's discipline is applied may raise due process concerns, it is well established that we review employee appeal's boards' consistency of sanctions for an abuse of discretion.  *See generally Kelly v. Salt Lake City Civil Serv. Comm'n*, 2000 UT App 235, ¶ 15, 8 P.3d 1048; *Lunnen v. Utah Dep't of Transp.*, 886 P.2d 70, 72 (Utah Ct. App. 1994), *cert. denied*, 892 P.2d 13 (Utah 1995).

sanction imposed." *See Harmon II*, 2007 UT App 336, ¶ 6. Nelson focuses his appeal on the second ground—that the charges do not warrant the sanction imposed. He also challenges two alleged procedural failures by the Board.

### I. The Charges Warranted the Sanction of Termination

¶20    The issue of whether the charges warrant the sanction imposed consists of two elements: "First, is the sanction proportional; and second, is the sanction consistent with previous sanctions imposed by the department pursuant to its own policies." *See Kelly v. Salt Lake City Civil Serv. Comm'n,* 2000 UT App 235, ¶ 21, 8 P.3d 1048. Nelson challenges the Board's decision relative to both elements.

### A. The Proportionality of Discipline

¶21    Nelson argues that termination was disproportionate to the charges against him because he had "16 years of exemplary service with the OCPD and has had no prior instances of excessive use of force or any other disciplinary issues." Nelson asserts that the Board specified only two reasons for terminating his employment: the September 19, 2009 incident with Fox, and Nelson's dishonesty about that incident. According to Nelson, because these two reasons are intertwined, "the failure of OCPD's assertion that Officer Nelson was untruthful results in the collapse of the reason for termination."

¶22    "'In determining whether the charges warrant the disciplinary action taken, we acknowledge that discipline imposed for employee misconduct is within the sound discretion of the [Director of Public Safety].'" *Id.* ¶ 22 (quoting *Lucas v. Murray City Civil Serv. Comm'n,* 949 P.2d 746, 761 (Utah Ct. App. 1997)). We also acknowledge that the Director of Public Safety "must have the ability to manage and direct his officers, and is in the best position to know whether their actions merit discipline." *Id.* Therefore,

> [w]e . . . proceed cautiously, so as not to undermine the [Director's] authority, noting, however, that [the Director] exceeds the scope of his discretion if the punishment imposed [was] in excess of "the range of sanctions permitted by statute or regulation, or if, in light of all the circumstances, the punishment is disproportionate to the offense."

*Id.* (quoting *Lucas*, 949 P.2d at 761).

¶23    This court has set forth several factors for measuring the proportionality of sanctions. "[E]xemplary performance by an employee may serve as evidence against termination, while job violations and continued misbehavior could weigh in favor of dismissal." *Harmon II*, 2007 UT App 336, ¶ 9, 171 P.3d 474; *see also Guenon v. Midvale City*, 2010 UT App 51, ¶ 16, 230 P.3d 1032 (mem.), *cert. denied*, 238 P.3d 443; *Ogden City Corp. v. Harmon (Harmon I)*, 2005 UT App 274, ¶ 18, 116 P.3d 973, *cert. denied*, 125 P.3d 102; *Kelly*, 2000 UT App 235, ¶¶ 25-26. The Board may also consider the following factors:

> "(a) whether the violation is directly related to the employee's official duties and significantly impedes his or her ability to carry out those duties; (b) whether the offense was a type that adversely affects the public confidence in the department; (c) whether the offense undermines the morale and effectiveness of the department; or (d) whether the offense was committed willfully or knowingly, rather than negligently or inadvertently."

*Harmon II*, 2007 UT App 336, ¶ 10 (quoting *Harmon I*, 2005 UT App 274, ¶ 18); *see also Guenon*, 2010 UT App 51, ¶ 16.

¶24    In determining that Nelson's termination was not a disproportionate sanction, the Board clearly did not rely on any alleged dishonesty on Nelson's part, finding instead that there was insufficient evidence to support the dishonesty charge. Rather, the Board relied on the factors outlined in *Harmon v. Ogden City Civil Service Commission*, 2007 UT App 336, 171 P.3d 474. *See id.* ¶ 10. Specifically, the Board found,

> The excessive force used by Nelson against Fox was clearly committed willfully and knowingly and there has been no allegation by Nelson to the contrary. There is also no question that the excessive use of force committed by Nelson was directly related to Nelson's official duties as the violation occurred while Nelson was on duty and in the normal course of Nelson's employment.

In addition, the Board found that "Nelson's excessive use of force . . . could substantially undermine public confidence in the [OCPD]."  The Board also found that Nelson's one-time use of excessive force had the potential to negatively impact the OCPD in many ways.  As the Board stated,

> Discipline that is anything less than termination could send a message to the public that an officer can get away with the excessive use of force with just a "slap on the hand."  [T]he citizens of Orem would not be accepting of Nelson's behavior seen on the video.  Loss of confidence in the police by the public would substantially undermine the ability of all Orem police officers to effectively perform their jobs.

The Board also found that "the use of excessive force by Nelson had the potential to significantly undermine the morale and discipline within the [OCPD]" and that "[f]ailure to terminate Nelson . . . would have sent the message to other . . . officers that a substantial violation of the excessive use of force policy would be tolerated with only minor punishment."

¶25    We conclude that the Board's decision did not "exceed[] the bounds of reasonableness and rationality."  *See Harmon II*, 2007 UT App 336, ¶ 6 (internal quotation marks omitted).  Thus, we uphold the Board's determination that the sanction of termination was not disproportionate to Nelson's violation of the OCPD's policies.

B.  The Consistency of Discipline

¶26    Nelson also argues that termination was inconsistent with prior OCPD discipline of other employees.  Specifically, he argues that his sanction was more severe than OCPD's action against former employee Officer Scott Healy, even though Healy's use of force was more egregious.  Nelson also contends that the Board did not offer an explanation for the disparate sanctions levied against him and Healy.

¶27    The issue here is whether the OCPD's termination of Nelson's employment "was consistent with the treatment of other officers for similar or more egregious conduct." *See Kelly v. Salt Lake City Civil Serv. Comm'n*, 2000 UT App 235, ¶ 27, 8 P.3d 1048.  To be consistent, the OCPD must simply "abide by its own policies."  *See id.* ¶ 28; *Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 761 (Utah Ct. App. 1997) (stating that the chief's "discretion is abused . . . if the punishment exceeds the range of sanctions

permitted by statute or regulation"). The employee "must, at a minimum, carry the burden of showing some meaningful disparity of treatment between [him or] herself and other similarly situated employees."[6] *Kelly*, 2000 UT App 235, ¶ 30. "Meaningful disparate treatment can only be found when similar factual circumstances led to a different result without explanation." *Id.* ¶ 31.

¶28 In 2000, the OCPD suspended Healy for two weeks without pay due to his use of excessive force during two incidents involving juveniles. In the first incident, Healy grabbed, shoved, and yelled at a juvenile he was holding in custody. In the second incident, Healy arrested a juvenile and transported him to a detention facility. There, in response to the juvenile's crude comment, "Healy pushed [the juvenile] against the wall and put his thumbs against his wind pipe" stating, "'I don't care if that guy is right there, I'm gonna kill you.'" "Healy then let go of the juvenile" and uncuffed him.

¶29 The Board determined that Healy's conduct was "substantially different" from Nelson's. First, the Board explained that Healy's use of force was not as excessive as Nelson's. The Board found,

> Although both [of the] incidents [involving Healy] were
> clearly inappropriate and both involved the excessive use of
> force, the extent of the force used was shoving a person
> against a wall and yelling and making threats . . . . There
> was no evidence that Healy inflicted any significant pain or
> injury on either of the two individuals.

---

[6]Nelson carries the burden to prove that the Board inconsistently sanctioned similarly situated employees. *See generally Sorge v. Office of Attorney Gen.*, 2006 UT App 2, ¶ 26, 128 P.3d 566 (explaining the differing perspectives on burden of proof as it relates to the proportionality and consistency of sanctions), *cert. denied*, 138 P.3d 589; *Kelly v. Salt Lake City Civil Serv. Comm'n*, 2000 UT App 235, ¶ 30, 8 P.3d 1048 (explaining that "the burden was on [the employee] to establish a prima facie case that the Chief acted inconsistently in imposing sanctions by presenting sufficient evidence from which the Commission could reasonably find a relevant inconsistency"); *Lunnen v. Utah Dep't of Transp.*, 886 P.2d 70, 73 (Utah Ct. App. 1994) (stating that "[o]nce the agency fulfills [the] initial burden" "to show that the discipline was not disproportionate to the misconduct," "it is incumbent on the employee to raise any due process concerns, including consistency"), *cert. denied*, 892 P.2d 13 (Utah 1995).

The Board contrasted Nelson's force as "unnecessarily placing Fox in painful control holds and inflicting pain and distress on Fox."

¶30    Second, the Board explained that after using force, "Healy immediately recognized his mistake and backed off, was immediately sorry, and did not continue the inappropriate behavior." Instead of "de-escalat[ing] the situation" and "recognizing and correcting his mistake," like Healy did, Nelson pushed Fox against the wall, threw him to the ground, and kept him "in painful control holds and inflict[ed] pain and distress on" him for "three minutes and 42 seconds."

¶31    Further, the Board found that, even if the incidents were factually similar, "there [wa]s an additional fair and rational basis for any perceived inconsistency in the sanction imposed." The Board explained that in the nine years since Healy's incident, another incident occurred with the OCPD that had "generated national and worldwide negative media attention." The Board reasoned that "public confidence . . . could have been significantly undermined if the video of the Nelson/Fox incident had become widely publicized and Director Larsen hadn't imposed the severest sanction available to him."

¶32    Although Healy's use of excessive force and threats were projected against juveniles and were undeniably egregious, the Board found that Healy immediately cooled down and backed off, whereas, conversely, Nelson continued to escalate his use of force against Fox. It is also significant that Nelson intended to impose pain and humiliation on Fox and, in fact, injured Fox to the extent that his forehead required stitches. We reiterate that "[t]he [Director] must have the ability to manage and direct his officers, and is in the best position to know whether their actions merit discipline." *See Kelly v. Salt Lake City Civil Serv. Comm'n*, 2000 UT App 235, ¶ 22, 8 P.3d 1048.

¶33    Moreover, even if Healy and Nelson were similarly situated, the Board offered a persuasive explanation for its disparate treatment. In the nine years since the OCPD sanctioned Healy, it was reasonable for the OCPD to have tightened its discipline in response to similar conduct.[7] No one can deny that, in an age where a video clip of Nelson's use of excessive force on Fox could have immediately "gone viral" on the

---

[7]The record is silent about whether the OCPD notified its employees that certain conduct would result in more stringent discipline. However, Nelson had notice via the City's employee handbook that termination may result from violating the City's policy.

internet, discipline deemed too lenient might have undermined the public's confidence in the police and been detrimental to both the City and the OCPD. Also, Nelson provides only the example of Healy, who was likewise disciplined for use of excessive force.[8] The City persuasively argues that the OCPD should not be barred from terminating an employee for conduct such as Nelson's because over the last decade public expectations of police conduct have changed and the OCPD has gained experience and wisdom in matters of police behavior and discipline. Furthermore, in considering only two cases, it is difficult for us to say that the OCPD's sanction of Nelson was the outlier, as opposed to its sanction of Healy. We accordingly uphold the Board's determination that the OCPD's sanction of Nelson was not inconsistent with its prior sanctions of employees.

## II. The Procedural Issues

### A. Nelson's Objections

¶34    Nelson argues that the Board exhibited partiality to the City, and thus violated his due process rights, when it denied Nelson's attorney the opportunity to object at the hearing while granting the City's attorney that opportunity. Upon hearing Nelson's attorney's first objection, the Board denied it, stating that the hearing was an "informal proceeding." Nelson claims that, in spite of this admonition, the Board granted the City's objections. Nelson cites an instance during the hearing when the City's attorney objected to Nelson's attorney's line of questioning of Director Larsen and the Board responded, "Noted. Proceed."

¶35    "'Despite the flexibility of administrative hearings, there remains the necessity of preserving fundamental requirements of procedural fairness in administrative hearings.'" *Sorge v. Office of the Attorney Gen.*, 2006 UT App 2, ¶ 18, 128 P.3d 566 (quoting *Tolman v. Salt Lake Cnty. Attorney*, 818 P.2d 23, 28 (Utah Ct. App. 1991)), *cert. denied*, 138 P.3d 589. Here, however, we conclude that the Board did not sustain the

---

[8]Before the Board, Nelson argued that several other similarly-situated OCPD employees had received more lenient discipline in spite of similar or more egregious conduct. The Board found that those situations were not factually similar because they did not involve use of excessive force. Nelson does not challenge this finding on appeal.

City's attorney's objection but merely noted it and allowed Nelson's attorney to continue his questioning. And even assuming the Board erred in overruling Nelson's objections, Nelson has not demonstrated that he was harmed as a result. *Cf. Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 755 (Utah Ct. App. 1997) (determining that although the commission may have erred, the petitioner "fail[ed] to establish how these procedural errors were harmful, e.g., he did not have time to prepare for the hearing or, how these procedures would have resulted in a different outcome absent such errors").

B. The City's Expert

¶36     Nelson argues that the Board erred by permitting Ken Wallentine to testify as the City's expert even though Wallentine had previously consulted with, and obtained confidential work product from, Nelson. Even assuming for the purposes of this argument that it was improper for Wallentine to consult with Nelson and then later testify for the City, his doing so was not prejudicial to Nelson. Nelson acknowledges in his brief that the Board referred to Wallentine in its decision only once. The decision states, "The City's expert Ken Wallent[i]ne testified that an officer in the excitement of the moment can have a different impression of what happened than what the video later shows to have actually happened." This single citation to Wallentine supported that portion of the Board's decision that explained why it found insufficient evidence to support the dishonesty charge against Nelson. On its face, it is not harmful to Nelson, and actually appears to be somewhat helpful. We conclude that there is no evidence that if the Board had excluded Wallentine's testimony for the City, it would have resulted in a different outcome for Nelson. *See generally Lucas*, 949 P.2d at 755.

CONCLUSION

¶37     The Board's decision to uphold the OCPD's termination of Nelson's employment did not exceed the bounds of reasonableness and rationality. Termination was not disproportionate to the charge of use of excessive force. Nelson has not demonstrated that his behavior was less egregious than that of Healy and, even if it were, we affirm the Board's well-reasoned decision to uphold Nelson's termination because one incident nine years ago should not create a rule to which the OCPD is committed in

spite of gained wisdom and a changing society. In addition, given the lack of prejudice to Nelson from any procedural deficiencies, we decline to disturb the Board's decision.

¶38    Affirmed.

_____
Michele M. Christiansen, Judge

-----

¶39    WE CONCUR:

_____
J. Frederic Voros Jr.,
Associate Presiding Judge

_____
Gregory K. Orme, Judge